Opinion delivered June 11, 1887.

## No. 5410.

## FRANCIS SCOTT *v.* THE STATE.

1. CHANGE OF VENUE—PRACTICE.—Defendant in a murder case applied for a change of the venue, alleging that such prejudice against him existed in the county of the forum that he could not get a fair and impartial trial in that county, and in support of the application he filed the affi- davits of three compurgators. Resisting the motion, the State assailed

the means of knowledge of the defendant's compurgators, and alleged that their residence in the county and acquaintance with its citizens were not such as warranted their representations; and the testimony of seven well known citizens sustained the issue tendered by the State. *Held* that no error is apparent in the overruling of the application for a change of the venue. It was not incumbent on the trial court to call the defendant's compurgators and examine them as to their means of knowledge.

2. CONTINUANCE—PRACTICE IN THIS COURT.—This court will not revise the refusal of a continuance by the court below, unless a bill of exceptions thereto appears in the record.

3. IMPEACHING A WITNESS BY HIS CONTRADICTORY TESTIMONY BEFORE GRAND JURY.—It is competent to impeach the testimony of a witness by showing that it conflicts with his previous testimony before the grand jury. Ruby's case (9 Texas Ct. App., 353) holds otherwise, but on this question was overruled in Clanton's case, 13 Texas Court of Appeals, 139.

4. MURDER—FACT CASE.—See the statement of this case for a chain of purely circumstantial evidence *held* sufficient to establish each and every material issue in a trial for murder,—except that of express malice, of which there was direct testimony.

APPEAL from the District Court of Bexar. Tried below before the Hon. G. H. Noonan.

The indictment in this case was presented on June 22, 1886, and contained three distinct counts, each charging the appellant with the murder of Frank Harris, in Bexar county, on the fifteenth day of September, 1884. The three counts concurred in charging that the homicide was committed with express malice aforethought, but each differed from the others as to the means by which it was committed, the first alleging that the deceased was cast and thrown into a deep cave, and was mortally wounded by the fall, the second alleging that he was struck on the head and killed with a blunt instrument, and the third that he was shot with a pistol. The cause came to trial in February, 1887, when the appellant was found guilty of murder in the first degree, and his punishment was assessed at confinement in the penitentiary for the term of his natural life.

Aside from the interesting chain of circumstances proved by the State to establish the charge against the accused, the legal aspect of this case is characterized by the very unusual fact that every issuable allegation of the indictment, except that of express malice, was supported by exclusively circumstantial evidence. No witness had personal knowledge that Frank Harris was dead, nor that if dead, he died by violence at the hands of another, nor that, otherwise than as evidenced by some clothing,

bones, teeth, etc., found in a cave along with a skull and skeleton, these latter were the remains or portions of Harris's body, nor that the accused had ever had any knowledge of or connection with the skeleton prior to its discovery. Each and all of these matters were established by circumstantial evidence after a lapse of nearly two and a half years since the disappearance of Harris.

It will be observed that some of the witnesses make mention of the killing of Gosling and of James Pitts, at or near New Braunfels, a town on the International railway, thirty miles from San Antonio and fifty from Austin. Gosling was United States Marshal of the western district of Texas, and, in the month of February, 1885, at or near New Braunfels, he was shot and killed in a railroad car by some prisoners whom he was conveying to San Antonio from Austin, where they had been convicted of robbing a postoffice. James Pitts, who was one of the prisoners, was pursued and killed while making his escape after Gosling's death.

Mary Brannon was the first witness for the State. She testified that she was a married woman, twenty-nine years of age. She had been married to her husband, Carroll Brannon, about ten years. She, with her husband, lived in Bexar county, Texas, about three miles southwest from the Leon Springs, and about two miles west of the San Antonio and Leon Springs road. The witness had known the defendant and his father, T. J. Scott, about seven years. James Pitts, who was killed about two years before this trial, was the brother of the witness. The witness formed the acquaintance of one Frank Harris, the alleged murdered man, at the house of T. J. Scott, in 1883. Harris was then working on Scott's place, which was about a mile and a half distant from witness's house. The witness last saw Frank Harris alive on the evening of Tuesday, September 16, 1884. He was then under contract to dig a cistern and repair a tank for witness's husband, and had been staying at witness's house about two weeks. Harris brought a sorrel horse and saddle and bridle to witness's house. Witness's brother, James Pitts, was living at the witness's house at that time. Witness's brother-in-law, Joe Brannon, now dead, was also living there at the time. No persons were at the witness's place on the said September 16, 1884, except the witness, her children and Harris. Witness's husband was in San Antonio, whither he went on Monday, the day before, and whence he returned on Wednesday. Late on the evening

of September 16, while witness, her children and Harris were sitting at the supper table, T. J. Scott (the defendant's father), and defendant and James Pitts, came to the witness's place. Pitts stepped into the dining room, covered Harris with his pistol, and ordered him to throw up his hands and keep quiet, promising not to hurt him if he obeyed. Harris threw up his hands, when Pitts told him to get up from the table. Harris did so, and presently stepped out of the house. Witness followed him as far as the door, where she discovered the defendant just outside of the door, and his father, T. J. Scott, a few steps further removed. Pitts then ordered the witness to go back into the house and "hush up." Witness turned back into the house, and Pitts went on towards the crib. He soon returned and told witness "not to bother." Witness was then looking out through a window. While thus looking, she saw T. J. Scott, Harris, and defendant ride off together, Harris being between the two Scotts. Harris was riding his own horse, which was gotten from the lot for him by one of the Scotts. T. J. Scott was armed with a Winchester rifle, and defendant with a small bright barreled pistol which belonged to Pitts. While looking out of the window the witness heard the Scotts, particularly the defendant, threatening and cursing Harris, and ordering him to hush up. T. J. Scott was then in the horse-lot, and Pitts was in the house with witness. About nightfall the two Scotts and Harris (the Scotts on either side of Harris) rode away from witness's house, taking a northwest direction, and that was the last that witness ever saw of Frank Harris alive. Pitts stayed at the house about thirty minutes and left horseback, going in the direction taken by the Scotts and Harris.

About an hour later, the two Scotts and Pitts, each riding his own horse, and one of the party leading a saddled but riderless horse, came back to witness's house. The two Scotts stopped at the fence, and Pitts came up to witness's gallery, got a drink of water, said that he was going to Scott's house that night, returned to and mounted his horse, and rode off with the Scotts and the riderless horse towards Scott's house. He did not return until the next morning. Witness could not now recall when she next saw either of the Scotts. Harris did not have his coat on when he was taken away. He had on a pair of dark pants with a small check or grain, a vest of the same material, a white shirt, a black hat, and common boots. He left a coat of the same material as the pants and vest he was wearing, a pair of "duck" working pants, and an every day shirt, at the house of the wit-

ness. The coat now exhibited to witness was the coat which belonged to Harris, and which he left at the witness's house when he was taken away by the Scotts. The fragments of a pair of pants and vest were here shown witness, which she declared to be of the same material of which Harris's said coat was made. Harris was rather a tall, slim and large, but not a fleshy man. There was nothing peculiar about his face or features that witness could remember, except that one of his front teeth, an upper tooth as the witness remembered, was plugged with gold. A human skull, to which the teeth were adhering, was here shown to the witness. Declining to swear absolutely to the identity of the teeth, the witness declared that the teeth in the skull bore a striking resemblance to Frank Harris's teeth, and that it was her belief and conviction that they were the teeth of Frank Harris.

At the time of and before the disappearance of Frank Harris, Pitts was waiting on Melissa Scott, the daughter of T. J. Scott, and the sister of defendant. He married the said Melissa on the third day of October following Harris's disappearance. Frank Harris had waited on Annie Scott, another daughter of T. J. Scott, and a sister of defendant. He often spoke to witness of Annie Scott in terms which impressed the witness with the belief that he was enamoured of her. In the February succeeding the murder on the train of United States Marshal Hal Gosling, the witness heard the defendant speak of Frank Harris in connecnection with Annie Scott. This was after the disappearance of Harris, and while the officers of the law were searching for his body. On this occasion witness remarked to defendant that the officers were looking for Harris's body. Defendant replied, in substance, that he was not afraid of Harris, and that Harris would never get his sister Annie. The conversation, which took place near Scott's residence when defendant and witness were en route to New Braunfels to attend the judicial investigation into the Gosling murder, then turned upon the excitement prevalent in the country, and the witness told the defendant that she thought he ought to leave the country, as the discovery of Harris's body would result in breaking his neck. In reply he asked how the discovery of Harris's body would involve him; said that he was not afraid of the officers; that his neck was too long to be broken by a rope; that Harris was a scoundrel too dirty to occasion him any bother, and closed his comments on the subject with a volley of oaths. This was the only time wit-

ness and defendant ever alluded to the fact that Harris, when last seen alive, was in company with the defendant.

The skeleton of a human being was subsequently found in a cave, about a mile distant from the witness's house. The witness did not know of the existence of that cave until the discovery of the skeleton. She had recently visited that cave. It was in a northwest direction from the witness's house, over a rough country. It was in the direction from witness's house taken by the Scotts and Harris when they left witness's house at dark on the evening of September 16, 1884. The witness had not seen Harris's horse to know it since it was ridden off by Harris on that night, unless, as she believed, it was the saddled but riderless horse brought to her fence by the Scotts, on the same night about an hour after they left the house with Harris. She had never seen Harris's saddle since that night, to know it. Witness thought, but was not positive, that Harris had a quirt. According to her recollection he also had a collar button, but she could not remember whether it was a gold, brass, pearl or bone button. The witness first disclosed her knowledge of the disappearance of Harris to her husband in June, 1886. She had kept secret the fact that Harris was taken by the Scotts from her house, because her brother, Jim Pitts, told her that, if that fact became known through her telling her husband, Frank Scott would kill her said husband. Witness believed her brother told the truth, and that Scott would kill her husband if she told him, and the fact thus became known. When the Scotts started off with Harris from witness's house on the night of September 16, 1884, the defendant, cursing Harris and ordering him to "shut up," said that he "had the right to take him," Harris. If Harris spoke to the Scotts, the witness did not hear him. Witness knew that Harris made a crop on the Scott place in 1883. She did not know the exact state of feeling between defendant and Harris when the latter left the Scott place, beyond the fact that they were at enmity. She heard defendant, a short time before the disappearance of Harris, say that he would wade in blood up to his waist before Harris should marry his sister Annie. Harris began work on the cistern and tank on the morning of the day of his disappearance, but did very little. He took his horse to water between eleven and twelve o'clock. Jim Pitts went to Scott's house before Harris started to water with his horse. Jim Pitts was in jail in the city of Austin in the month of February, 1885. Wit-

ness was familiar with Pitts's hand writing, and was confident that the letter here exhibited to her was written by him.

Cross examined, the witness stated that, while she supposed that the disappearance of Harris was the subject of much comment in the neighborhood, she had heard but little of it herself. She never heard any one but old man Scott (T. J.) say, after Harris's disappearance, that he was still alive, and that was after the judicial proceedings over Gosling's death, in New Braunfels. The witness was absolutely indifferent in her feelings towards the Scotts. She did not dislike defendant enough to swear a lie against him. Nor did she like him well enough to tell an untruth in his favor. Since the killing of James Pitts, for which the Scotts were responsible, the witness had not entertained kindly feelings towards them. Witness was unable to say whether or not jealousy existed between Pitts, who was addressing Melissa Scott, and Harris, who was addressing Annie Scott. Witness never heard of a difficulty between Pitts and Harris prior to the night of Harris's disappearance. Pitts took Harris out of witness's house when the Scotts took him off on the night of his disappearance. Just before starting off with Harris, defendant told Harris if he did not "shut up" he would blow the top of his head off. Old man Scott cursed and threatened Harris. From the window she occupied, the witness saw old man Scott take Harris's saddle from a tree on which it was hanging, but she did not see who put it on Harris's horse. The witness, when she heard defendant threaten Harris, did not know defendant as a "blowhard" and braggart. She knew of his having hurt his brother-in-law, Crowder. Witness believed then that had she told her husband of the Scotts taking Harris off, defendant, on learning it, would have killed her husband to get him out of the way. Witness did not tell her husband about the Scotts taking Harris off until after the killing of Joe Brannon. She knew that her husband afterwards went to San Antonio, but she did not know what business took him. He did not tell witness that his purpose in visiting San Antonio was to secure the indictment or arrest of defendant because of the disappearance of Harris. The officers came to witness's house on the evening after witness told her husband, and she was then informed that they had come to search for Harris's body. When her husband got back from San Antonio, on the day after Harris's disappearance, he asked witness where Harris was, and witness merely told him that he went off,—having in her mind

Pitts's warning that, if she told the truth, defendant would kill her husband. If the Scotts tied Harris on the horse when they they took him off, witness did not know it. Witness knew Miss Alice Tye and Mrs. Crane. She and Mrs. Crane had several conversations about Harris, but witness had never spoken to Alice Tye about Harris. She could not recall what passed between herself and Mrs. Crane about Harris. Witness denied that she ever told Mrs. Crane, Will Lee or Melissa Pitts that Pitts and Joe Brannon took their horses to water on September 16, and would not take Harris's horse, and that Harris became angry for that reason and followed them, and had never been seen since. The witness heard no shots fired after the Scotts took Harris off. In January, 1885, when Pitts was in the Austin jail (which was a month before the murder of Gosling and the kill-ing of Pitts), Mrs. Melissa Pitts told witness that she was going to take a pistol to Austin for her husband, James Pitts. She took Pitts's pistol from witness's house with the avowed purpose of taking it to Pitts at Austin.

Carroll Brannon, the husband of the first witness, was the next witness for the State. The substance of his testimony, so far as the same is important to this report, may be stated as follows: The witness went from his home near Leon Springs, to San Antonio, on Monday, the fifteenth day of September, 1884, leaving Harris at his house. When he got back on the Wednes-day evening following, Harris, his horse, saddle and bridle were gone. Since then the witness had seen nothing of Harris alive, nor of his horse, nor of his saddle to know it. He saw a saddle tree on the habeas corpus trial of this defendant which was said to have been found in the woods somewhere west of Scott's house, and which looked like Harris's saddle tree, though wit-ness could not positively identify it. Harris left the coat in evi-dence at witness's house, and wore off a pair of pants and vest of the same material as the coat. The fragments of cloth in evidence appear to witness to be of the same material as the said coat. He wore off a pair of half worn brogan boots, num-ber eight or nine, and witness was satisfied that the boots in evidence were the boots worn off by Harris. Harris had lost one of his front teeth, and had one which had been plugged with gold. One of his front teeth lapped over the others. Wit-ness here examined the skull in evidence, and pronounced the teeth in that skull to be the teeth of Frank Harris. The space for the missing tooth in the skull corresponded with the space in

Harris's mouth. The plugged tooth and the lapping tooth in the skull corresponded with those of Harris. Harris had a quirt very like the one in evidence. It was the recollection of the witness that Harris had an old knife, but he could not now swear to anything of a positive nature about the knife.

The witness's brother, Joe Brannon, was killed on the third day of June, 1886. Soon after that the witness was informed by his wife of the fact that T. J. Scott, the defendant, and Jim Pitts came to his house during his absence in San Antonio, in September, 1884, and took Harris off with them. Upon obtaining this information, witness went to Judge Boerner for advice. Boerner advised witness to make a complaint against the two Scotts, and witness did so. The witness then went before the grand jury, by direction of the sheriff. This was before the arrest of the two Scotts. Jim Van Riper, Jim Applewhite, Ed. Stevens, Ed. Van Riper and witness then went to the Scott neighborhood in search of Harris's remains. From witness's house this party went to the house of the Bourgeois boys, and from there went in search of caves. In the fourth cave discovered by this party the skeleton of a man was found. The witness had no previous knowledge of the existence of that cave. That cave was about a mile and a half northwest of the witness's house, on the side of a mountain and in a small mott of timber. The mouth of the cave was surrounded with underbrush, and looked so much like a rat hole as to attract but little attention. It would measure not more than eighteen inches across the opening. A Mexican went into the cave and brought out some human bones. The skull was badly smashed and jammed. Some teeth were found, and the shin bones of a man were found in a pair of brogan boots. The remnants of a vest and pair of pants were also found. The bones, skeleton, skull, teeth, etc., and the fragments of a vest and pantaloons, in evidence, were the articles so discovered in the cave. Witness thought the skull compared "mighty well" with the skull of Frank Harris, who had a "considerable large head" and a broad chin bone. The witness's house and also the cave in which the human remains were found are in Bexar county, Texas. Witness had several times heard defendant say he would kill Harris before the latter should marry Annie Scott. Defendant was speaking about Harris going to see Annie, and spoke of a row he had previously had with Harris, and swore he would kill Harris before he should have Annie. About a

week before Harris's disappearance the defendant said he came d—d near getting Harris once, and that if he commenced again he would fix him sure. In October or November after the disappearance of Harris, the witness fell in company with defendant and old man Scott, and traveled two or three miles with them. On that occasion the defendant gave to witness a pistol to carry—a short, thick, heavy British bull dog pistol, which was a forty-four or forty-five calibre pistol, and would shoot four or five times. It belonged to James Pitts, who was in the habit of letting the defendant carry it, and who owned two pistols. Defendant handed the pistol to witness and asked if witness would carry it in his saddle bags. Witness took the pistol and saw it was Pitts's, and said to defendant, "how does this pistol shoot, anyway?" Defendant replied: "I don't know; I never shot it but once, and then I killed Frank Harris with it." Old man Scott heard this, being right beside defendant, but never opened his mouth. Two or three days afterwards, witness asked old man Scott what the defendant meant, and the old man man "kind of got mad," but subsequently said: "Frank can't keep a secret—he tells everything he knows;" and then the old man changed the subject of conversation. Witness gave the pistol back to defendant the same evening the latter got him to carry it. Pitts and the Scotts continued to be friendly until Pitts was killed.

Cross examined, the witness said he had known the defendant and old man Scott for seven or eight years, and they had all been on good terms, but witness now had no love for the defendant. He did not entertain enough grudge against defendant to tell a lie on him, nor enough love for him to keep any secrets on him. At the time the defendant said he had fired the pistol but once, and then killed Frank Harris with it, witness did not even think that Harris was dead, and never took much thought about the matter until his wife told him of what occurred to Harris during witness's absence at San Antonio in September, 1884, and that explained things to witness. He said something afterward about it to the officers, but not at that time. Pretty soon afterward he told Tom Manning of what the defendant had said, and, prior to the killing of his brother, Joe Brannon, he said something about it to Walker and Ferris. "I would not have kept any secrets of Frank Scott killing no man if I had found out anything positive before or after I had learned that Frank Scott had given information to the Messrs. Van Riper that Joe Bran-

non was in the country." Witness went to Justice Boerner for advice. He was determined to prosecute Frank Scott, if there was any chance, after learning that he had taken Harris; but he made no move to prosecute him until after Joe Brannon was killed, inasmuch as, until he received the information given him by his wife, he knew nothing more than what defendant had said about the pistol. Speaking of the skull in evidence, the witness said: "I believe that I could point out that particular skull if it were taken up here to the graveyard and put with twenty-five, thirty or fifty other skulls. I think I could. I think I could pick them teeth out. I am positive, almost positive, that is Frank Harris's teeth. I would not be positive I could. I swear mighty positive that is Frank Harris's teeth in that skull. I don't know just about the skull; I will swear that is the skull of Frank Harris, to the best of my knowledge. I am pretty positive as to Frank Harris's teeth. That is what I say,—that it is Frank Harris's skull; I say that it is to the best of my knowledge and belief, Frank Harris's. The tooth that was plugged was on the right side. I said the affected tooth was there; the rotten tooth is further front on this side." After a good deal more of similar import, the defense asked the witness whether he said those were or were not the teeth of Frank Harris, and he answered that, to the best of his knowledge, they were. Some time after the disappearance of Harris, the defendant said he would have killed Frank Harris the Sunday they had a row, if it had not been for Grandmother Drowns. Joe Brannon was killed June 2, 1886, and in a few days thereafter, perhaps within three or four, the witness made the affidavit before the justice of the peace, and brought the papers to San Antonio. He went to the district attorney and the grand jury room. Witness did not present Frank Scott before Commissioner Stephenson for mail robbery. G. G. Walker made the affidavit against Frank Scott for that offense, upon information obtained from Charley Yeager, of Chester, Illinois. Witness did not talk to Walker about that until after defendant was arrested on the charge of mail robbery, and never got up any prosecution against the defendant except in the present case, wherein he reported defendant to the grand jury. Witness understood, before he went to the justice of the peace, that the defendant informed the two Van Ripers of the whereabouts of witness's brother, Joe Brannon, when the latter was killed. "I may have blowed it around that Frank Scott killed my brother, but that is all right; so he

did; he shot him in the back, too; but that has nothing to do with this."

Referring to the boots in evidence, the witness said he would not swear point blank that they were Frank Harris's boots, but he believed they were the boots Harris habitually wore, and thought he knew them as well as he did his own. Harris had no shoes, and only this one pair of boots. He thought it was on June 11, 1886, when the clothes, boots, skull, etc., were found in the cave. Witness denied that he ever told Louis Bourgeois that Frank Harris had followed the boys to the tank, and that that was the last Mrs. Brannon had seen of him. Witness could not say that the saddle in evidence was Frank Harris's saddle, but in shape and make it resembles Harris's saddle-tree. It was said to have been found somewhere in the woods by Will Lee or Will Reynolds, and was taken to San Antonio. In substantial accord with the testimony of his wife about the abduction of Harris, the witness related what she told him about that occurrence.

Thomas A. Manning, for the State, testified that in March, 1884, Frank Harris worked for him, stayed with him in the same house, and ate with him, for some three weeks while they were building a lime kiln. Harris was about six feet and an inch in height, and had light brown or auburn hair, a moustache, blue eyes, tolerably fair skin, and claimed to be twenty-eight or nine years old. There was some peculiarity about his face, mouth and teeth. Witness had examined Harris's teeth, and said that at one corner of Harris's mouth there was a small tooth, and adjoining it a whole tooth which was lifted a little over it. The next tooth was decayed, and the next one to that was plugged with gold. Witness thought he could identify those teeth, and the skull and teeth being shown him he said, "these are the teeth I saw in Frank Harris's head—the upper teeth." After detailing the circumstances under which he closely inspected Harris's mouth and teeth at the latter's request, the witness said, "from that examination I can swear those are Frank Harris's teeth." He would not say much about the head or skull, as all the scalp and hair were missing, but the under jaw resembled Harris's, which was very thick. Before this skull and the teeth were ever exhibited to witness, he had described Frank Harris's teeth to the grand jury and elsewhere, and had described them as he had done in his present testimony. And before the skull was found he had given the same description of Harris's teeth, remarking at the time that if Harris's remains

were found he could identify them by the teeth. Speaking of a hole in the skull in evidence, the witness said it looked very much like a bullet had entered there. The next day after the Sunday on which the defendant and Frank Harris had a row, the witness had a talk with defendant at Gilbert's store, and the defendant said he had been to San Antonio to get papers for the arrest of Harris for threatening his life, and was going to arrest him. The witness, being shown the boots in evidence, said he believed them to be Harris's boots.

Cross examined, the witness stated that a bullet will make a larger hole at its exit than at its entrance, and, judging by the appearance of the holes in the skull, he thought they were made by a bullet. Referring to the teeth shown him, he pronounced them to be the same he had examined in Frank Harris's mouth. He detailed circumstances which enabled him to identify Harris's boots by their having been half-soled and their condition other-' wise, and said he would swear that the boots in evidence were Harris's boots, and he knew that Harris had them half-soled by a man named Remling. About September, 1885, there was a little trouble between witness and defendant, on account of some slanderous talk of defendant with regard to witness's wife. Witness had forgiven defendant, and retained no animosity against him. He acknowledged that he had talked a good deal about the present case, to the effect, as well as he remembered, that if Frank Scott was guilty of the murder of Frank Harris he should be punished, and, if not guilty, he should be turned loose. He did not believe that he had said that Frank Scott was guilty and should be punished, though he had said he believed Frank Scott was guilty.

Celestine Yeager, for the State, testified that on one Sunday morning, in November, 1885, at Gugge's store, the defendant took him behind the house and asked him whether he had heard that he, defendant, had been arrested for stage robbery. Witness replied that he had heard of it, and defendant said that deputy marshal Walker had made an affidavit and had him arrested, and that if Walker was not careful he, defendant, would blow the son of a bitch's brains out and throw him in the same cave where he had thrown Frank Harris. Defendant did not say where the cave was, and witness asked him no questions.

Cross-examined, the witness said he thought but little, at the time, about the defendant's talk to him at Gugge's store. Being asked why he went and told the marshal at Austin about this

talk, the witness said the marshal spoke about having to come down and arrest Frank Scott on some other charge, and witness told him he had better not, or Frank would surely put him in the cave where he had put Harris. By that time witness had concluded that what defendant had said to him might be true. He denied that he had any hard feelings against defendant, and said he had never believed or stated that "Frank Scott, on account of his big mouth and talking, was the cause of all us being arrested and put in the New Braunfels jail." On Frank Scott's last trial at Austin, witness and Manning and Carroll Brannon were witnesses for the prosecution, and there was a hung jury. Gugge and others were at the store when the defendant called witness aside and told him what witness had already testified in chief. Defendant did not caution witness to say nothing about it, and witness mentioned it to a man named Broaddus, who was working with him.

W. L. Gilbert, for the State, testified that in 1884 he was living about seven miles from San Antonio on the road to Fredericksburg, which goes by Leon Springs, and, about dark on Monday, the fourteenth or fifteenth of September, 1884, defendant came along on horseback from the direction of San Antonio. Defendant stopped, dismounted, got some water, and sat down. He told witness he had been to San Antonio to get a warrant for the arrest of Frank Harris, whom he was going to put under a peace bond. He said that he and Harris had had a difficulty the previous evening, in the lane at his father's, and that Harris had threatened his life. He said that if he ever met Harris one of them would die: "If we ever meet I will sure go for him; he will either kill me or I will kill him if we ever meet." Witness told him that was all foolishness, and that Harris would not hurt anybody, and though he might get in a passion it would be over in a minute. Defendant replied that witness did not know, and said that his difficulty with Harris grew out of Harris wanting to marry his sister.

William Simpson, for the State, testified that he lived about seven miles from San Antonio, on the Fredericksburg road, and about three miles from the Scotts. He knew the defendant and Frank Harris, and described the peculiarities of the latter's teeth. Without positively identifying the teeth in evidence as Frank Harris's, he pointed out the coincidences between them, and said they were exceedingly alike if not the same, and the jaw bone shown him was also like Harris's. Pointing to a hole in

the skull, he said that it was certainly a bullet hole, and he thought the bullet had penetrated downwards and passed out at a point he designated. In August, 1883, witness heard Harris and the defendant in a conversation which was partly conducted in the Mexican language, which witness did not fully understand. They were playing cards and got to differing. Defendant told Harris that he could not marry his, defendant's, sister, and Harris retorted that he could marry "any one of the d—d outfit." A young man named Thompson came in with a double-barrelled shot gun, and Harris jumped up and took it, and leveled it at the defendant, who was then outside on the road. Witness grabbed the gun, took it away from Harris, and fired both barrels into the road. Harris then drew his pocket knife, and defendant drew his knife and rushed past the witness, and Harris and defendant clinched. Thompson took Harris's knife away from him, and witness took the knife away from the defendant. This occurred at Gilbert's store in the latter part of August, 1883. Harris received just below his shoulder blade a slight cut which the witness presumed was made by the defendant. Harris and defendant went off together on horseback. In the summer of 1884 witness saw the defendant on the plaza in San Antonio, and defendant told witness he was going away from home to work at his trade, as he wanted to get away from his crowd, and that Frank Harris had to keep his mouth mum. Witness asked defendant if he and Harris were friendly, and he replied "yes, but Harris has to keep his mouth mum." The cross-examination elicited nothing of consequence, except the witness's admission that the hole in the skull which he took to have been the exit of a bullet might have been caused by a fall.

George M. Jones, for the State, testified that the last time he saw Frank Harris alive was in September, 1884, and on a Sunday, about sunset, when Harris was on his horse in front of old man Scott's. Defendant was standing close by Harris and between him and the house, and they were quarreling. The d—d lie was passed between them, and witness thought it was given by the defendant. Witness heard nothing that was said by Harris. Since that occasion the witness had never seen Harris, but had heard rumors about his disappearance. Three or four months after witness last saw Harris, he heard people wondering what had become of Harris.

J. W. Van Riper, for the State, testified that in September, 1886, he was a deputy sheriff of Bexar county, and, in June of

that year, he had occasion to go to the neighborhood in which
Carroll Brannon lived. He was accompanied by said Brannon,
E. O. Stevens and Jim Applewhite, and the object of their trip
was to search for the body of Frank Harris. On the morning of
June 10, 1886, they went to the house of Bourgeois, and got
Louis and Emil Bourgeois, and the party set out on a search for
caves,—the supposition being that Harris's body was in a cave.
They first went to a cave north of the old Matsdorf place, and
thence to another cave which was a half or three fourths of a
mile further north. They merely looked into these caves from
the top. Then they started to a cave which was about a mile
and a half or two miles east of Brannon's house, but one of the
Bourgeois boys spoke of a cave which he had once seen when he
was cutting cedar. He said it was too small a cave to admit a
body, but witness said they would go and look at it, and they
did so. Stevens set a newspaper on fire and dropped it into the
cave, and some of the party thought they saw a pair of boots in
there, though others thought the object was a chunk of wood.
After examining other caves and passing the night at McCall's
ranch, the party secured the assistance of a Mexican miner and
returned to the cave into which they had dropped the burning
newspaper. They lowered the Mexican into it, and as soon as
he got into it he exclaimed that there was a pair of boots, and
hallooed to be taken out, saying that somebody was trying to
drag him off into the back part of the cave. He begged so pite-
ously that he was drawn up a few feet and told that another
man would be sent down. Another man took a coffee sack and
got the bones into it, and the man and sack were pulled up out
of the cave. Witness saw the bones when they were brought out
of the cave. They were turned over to Judge Boerner, and he
held an inquest. They were human bones, and the foot and shin
bones were in the boots. Here the witness identified the skele-
ton, bones, boots, remnants of clothing, and a quirt, which were
in evidence, as the same which had been brought up out of the
cave. The skull was all in pieces when taken out, and the pieces
were not fastened together as they were at the trial. They did
not find the lower jaw bone. Judge Boerner afterwards got
some of the bones. The cave was about a mile and a half north-
west of Brannon's house, and was on the side of a hill, which
some people might call a mountain. Scattered live oak brush
grew on the side of the hill, and the cave was not easily seen.
The mouth of the cave was eighteen inches across, and about

twenty-four inches at its longest part. They sounded it with a rope, and concluded it was about thirty feet in perpendicular depth. Witness had lived for nearly ten years within eight or nine miles of that cave, and never knew of it before the search for Harris's body. Witness learned of it from Louis Bourgeois, not from Brannon. From Brannon's house to that of the Scotts the distance is about two miles. The coat in evidence was procured by witness at the house of Carroll Brannon, who gave it to witness the day the body was found, and witness then compared it with the clothing brought up with the bones, and thought they were the same material. Witness's party brought nothing up out of the cave except the bones, boots, clothing, etc. They searched the cave in the middle of the day, when the sun was overhead, and could see loose boulders, and rocks at the bottom. Whether a man could have fallen from the top of the cave to the bottom without striking anything, the witness could not say. Such a fall, however, would be liable to break a man's skull upon the rocks at the bottom of the cave. About ten or twelve feet from the top the cave seemed smaller than at its mouth. The cave is in Bexar county, Texas. °

Previous to the arrest of the defendant, he and witness had several conversations about Harris, but witness could not now relate them all. One of them occurred in the court house while the grand jury was in session, at the autumn term, 1884, of the district court. Witness was bailiff to the grand jury at the time, and the defendant came and said he wanted to make a presentment to the grand jury,—that he had had a difficulty with Harris, and that Harris had been threatening his life. That conversation occurred a day or two after the difficulty between defendant and Harris at old man Scott's.

William Boerner, for the State, testified that in the summer and fall of 1886 he was justice of the peace of precinct number two of Bexar county, in which the Scotts and Carroll Brannon lived. Defendant was then the constable of the precinct. Witness knew a man named Frank Harris, but had not seen him since 1882 or 1883, and heard of his disappearing from that neighborhood. There were rumors about it in 1885. Seven or eight days after the inquest Carroll Brannon went to witness's to swear out an affidavit against defendant and T. J. Scott, holding them responsible for the disappearance of Frank Harris. Witness held an inquest on the remains of Joe Brannon on June 2, 1886, and on the eleventh of the same month held an

inquest on the remains of Frank Harris at what is known as
the "Robber's Cave." About fourteen days after the latter in-
quest the witness, not being satisfied with the search previously
made by Van Riper's party, went into that cave, accompanied
by George Marnoch and Hunter, and they found the balance of
the skeleton, consisting of pieces of the skull, the lower jaw,
the shoulder bones, some arm bones, a thigh bone, a hip bone,
and a lot of small bones. Witness brought them to the court
house and delivered them to the sheriff, and they were put to-
gether with the rest of the bones. Witness also brought in the
quirt in evidence, and identified all the bones, etc., in evidence
as those he had been speaking of. Referring to a hole in the
skull, the witness said it was round and just the size of a rifle
bullet. "It is about three-fourths of an inch hole. It goes clean
through that portion of the skull here. The inside is larger than
the outside; the edges are sharp and broken. The part of the
skull where the bullet entered is broken,—by the bullet, of
course. The skull is in three pieces where the bullet hole is, and
the joining of these three pieces of skull shows where the bullet
hole is. It requires these three pieces to be put together to show
that round hole. The skull is now fastened together by wires,
and is in ten or eleven pieces. I have never examined that skull
to see whether there is any point of exit of that ball. It could not
well get out here at the top. I say that I think the shot entered
on the left side, coming out on the opposite side near the jaw.
I said it could not be coming out on the top; the man must have
been on horseback who did the shooting, because I believe the
shot ranged down."

Speaking of the cave, the witness said the entrance was barely
large enough to admit a man. It was "a kind of oblong round
hole on top." Witness took no measurement of it, but had been
in the cave three different times. It was funnel shaped and
wider at the bottom, where there is a kind of rock gravel all
packed together. Witness found in the cave a cart load of lime-
stone rocks that did not belong there, and which "had only re-
cently been put there by the hands of man, because they had a
bluish tint." He examined these rocks particularly; they were
not of the same formation, and they came from the top on the
outside. There was no way they could have washed in there;
they had been thrown in. There was a whole lot of small twigs,
as big as pipe stems, and there was an elm log about six feet
long and six inches thick. A man of Harris's size and weight,

if thrown into that cave, would go down like a shot. The depth of the cave at the spot where the skeleton was found, was a little more than twenty feet. "That just accounts for the skull being broken that way; he must have entered head foremost."

In the spring or summer of 1884, the defendant complained to witness about Harris threatening his life, and wanted to know what he had better do about it. Witness advised him to make affidavit and put Harris under a peace bond, but he did not do so. Afterward, on September 28, 1884, which was subsequent to the disappearance of Harris, the defendant and Jim Pitts came and made a similar complaint to witness. Pitts was the spokesman on this occasion.

Doctor E. J. Carothers, a practicing physican and surgeon, testified that when he first saw the skull in evidence it was in thirteen fragments, and that he put them together with wire sutures. He specified certain portions of the skull which were still missing. After minutely describing different bones and portions of the skull, he stated that, after fitting the fragments together, he discovered the hole in the right side of the skull, which was nearly round and a little more than three fourths of an inch in diameter, and somewhat larger on the inside than the outside. The hole is in the right parietal bone, and, in witness's opinion, it was made by some kind of a bullet or other missile projected with great force, and not from the human hand. It might have been made by a stone. The witness pointed out a spot where the missile may possibly have made its exit, but, on account of some missing fragments at that spot, he could not say positively whether it did or not, and did not think it probable that it did. The skull was a human skull, and witness thought it was the skull of a man over twenty-four years old.

A. D. Zavalla, for the State, testified that he had for five years been the postmaster at Shavano, eleven miles from San Antonio on the Fredericksburg road. He knew the defendant and his father, T. J. Scott, and also Frank Harris, whom he last saw late in the summer of 1884, and whose post office was Shavano. Witness had known Harris a year or more. Harris, when he would go off, would write to witness to forward his mail, or would direct him to hold it. In the fall of 1884 the witness first heard of the sudden disappearance of Harris from that neighborhood. Harris had not then nor since given directions about his mail to witness. Two or three letters for Harris arrived after his disappearance, and witness, thinking he might return, held

them for a time, but they had been sent to the dead letter office. Witness recognized the teeth in evidence as Frank Harris's teeth, and said that he could not be convinced to the contrary, otherwise than by seeing Frank Harris in person.

Doctor T. R. Chew, an experienced physician, gave a full description of the skull and facial bones in evidence, and of the effect produced by gun shot wounds upon them. From the skeleton he concluded the deceased was a man at least six feet high, and thought the hole in the skull was made by a gun or a pistol shot which ranged downward, as though fired by a man on horseback into the head of a person on foot.

August Flathaus, jr., for the State, testified that he lived about three miles from the Scotts, and about two years ago found a saddle tree in a great big thicket about two miles from where the Scotts lived. He thought he found it in the summer of 1884, but was very uncertain about the date. The leather was old and was cut up into strips, and the wooden stirrups were the only portion of it he took away. He had never seen it in the possession of Frank Harris, and that he found it in the woods was all he knew about it.

A. Kahn, an experienced clothing merchant, being shown the coat left at Brannon's by Harris, and the remnants of clothing brought up out of the cave, testified that they all seemed to be of the same material, though the remnants were faded.

John Remling, for the State, testified that he had lived in the upper part of Kendall county, and had known a man named Frank Harris. He last saw Harris about the last of August or the first of September, 1884, at witness's house, where he had been helping witness to build a pasture fence. Harris had a sorrel horse which was branded TE, and took that horse with him when he left witness's place. While at witness's Harris received some letters, and one or two of them were from Annie Scott. Witness sometimes cobbled shoes, and he half soled for Harris a pair of common, coarse boots. He patched their soles and used wooden pegs in doing so. After inspecting the boots in evidence the witness said they looked very much like Harris's boots. "It looks like some of my work that I have done; it looks like the work that I do." He generally drove some nails in the bottom when the heel begins to runs down. In May, 1884, witness sent for a pair of boots for Harris, which he wore for some time, and then the witness half soled them. Being shown the coat in evidence, the witness said it looked like Har-

ris's coat, but it seemed to him that Harris's coat had a larger check—though he did not "pay much attention to it."

Cross examined, the witness was not positive that the boots in evidence were the same boots he half soled for Harris, but he thought the half soling on them was his work. Harris and defendant were together at witness's house in the summer of 1884, and they seemed to be friendly.

At this stage of the trial the State rested.

William Van Riper was the first witness for the defense. He testified that in September, 1884, he was a deputy sheriff of Bexar county. He did not remember that the defendant and Will Lee were at San Antonio on Monday, September 15, 1884, attending the District Court as witnesses in the Dolores Rosa case; though it was more than likely he summoned them. Witness heard of a difficulty at Scott's house, but did not see it, and could not remember the date of it, except that it was on a Sunday evening. Witness, who had been summoning witnesses to appear before the grand jury, came by Scott's somewhat after dark that Sunday, and the defendant told him about a fuss which had occurred that day between himself and Frank Harris, and asked witness what he should do about it. Witness told him the grand jury was in session, and, if he thought his life was in danger, advised him to go before the grand jury and have Harris indicted or put under a peace bond. . The defendant concluded he would go before the grand jury and have Harris indicted, and he did come to San Antonio the next morning for that purpose. Witness saw him about two o'clock in the afternoon of that Monday, and did not again see him on that occasion. Witness saw Carroll Brannon in San Antonio about ten o'clock on that same Monday.

In June, 1886, witness was a deputy United States marshal, and had a warrant for Joe Brannon, a brother of Carroll Brannon. Witness was not acquainted with Joe Brannon, but knew of him as a bad man, and was informed by J. E. Van Riper, his brother, where Joe could be found. J. E. Van Riper started with witness from San Antonio, and on their way they got the defendant to accompany them because he knew Joe Brannon. They found the defendant at work building a pasture fence on the Fredericksburg road. This party of three went to Carroll Brannon's place in search for Joe Brannon, and Joe Brannon, while resisting arrest, was killed about a mile and a half from Carroll Brannon's house. Defendant went with witness to the

place where Joe Brannon was killed. On their way from San Antonio the defendant told witness of Joe Brannon's being in the country, and had previously given that information to J. E. Van Riper.

Cross examined, the witness stated that the defendant, in speaking of his fuss with Harris on the Sunday evening above referred to, said that he had ordered Harris away from his house and told him not to come there any more. Defendant said that he did not like such men as Harris, but witness could not now say that he gave that or any other as the reason he ordered Harris off his place. A number of persons, most of whom the witness did not know, were at Scott's house when witness got there on that Sunday night. He knew that Jim Pitts was there, and thought, though he was not certain, that Will Lee, old man Scott, Ditson and Mrs. Drowns were there. Harris was not there. The difficulty between defendant and Harris, according to defendant's statement, occurred just before sundown on that day. He said that the row was about Harris coming to his house after he had been once before ordered off, and warned not to return. Defendant did not say that Will Lee was at his house at the time of the row. He did not say how long Harris had been at the house when the row occurred. It was the recollection of the witness that Mrs. Pitts and Annie Scott were present.

Louis Bourgeois was the next witness for the defense. He testified, in substance, that he lived near Leon Springs, in Bexar county, and that he had known Carroll Brannon about seven years. The witness remembered that he had a conversation with Carroll Brannon about the disappearance of a man named Frank Harris, who, it was said, disappeared on the sixteenth day of September, 1884. The witness was unable to say whether or not it was on the seventeenth, eighteenth, or a subsequent day of September that he saw Carroll Brannon. At this point the witness was questioned as follows:

"Did you or not, on September 17 or 18, somewhere between your house and that of Bourgeois, in Bexar county, State of Texas, tell Louis Borgeois(?) that Harris had followed the boys to the tank,—the water hole,—which was the last that Mrs. Brannon saw of him? Did you or not have such a conversation as that with Brannon?"

The witness answered: "We spoke something similar to that, but I don't believe it was in that way. I could not say when it was; it was either the seventeenth, eighteenth or twentieth."

Questioned whether he had ever had another conversation with Brannon, and, if so, when, the witness replied, in substance, that he could not locate accurately the time of his conversation with Brannon, but it was subsequent to the disappearance of Harris.  It may have been during the week of Harris's disappearance, or the first or even the second week thereafter.  He could not locate exactly the point where the conversation was had, but it was either on the road between his and Brannon's house, or at the witness's house after they had reached it..  Witness asked him how he was getting along with his tank, and Brannon replied that, after about three feet of it was dug, Harris quit work for some reason unknown to him; that he did not know why Harris quit the work or where he had gone; that on his return from San Antonio he asked his wife if she could tell when he left, and that she replied that she could not.  He said, further, that he, Harris, had a little row at Scott's on the Sunday before; but that, if Harris left because of the fear of arrest at the instigation of the Scotts because of that row, he, Brannon, did not know it.

Cross examined, the witness stated that he conducted the officers to the cave, and was· present when the skeleton, boots, and clothing were taken out of it.  While cutting poles near it, about five years ago, the witness discovered that cave, never having heard of its existence before.  He had no recollection of ever reporting his discovery of the cave to any one.  The mouth of the cave, when witness first saw it five years ago, was not more than a foot or a foot and a half in diameter.

Mrs. Laura Scott, the wife of T. J. Scott, and the mother of the defendant, was the next witness for the defense.  She testified, in substance, that as well as she could recollect the defendant left her house on the morning of Monday, September 15, 1884, to go to San Antonio, and on Tuesday evening, at an hour not now remembered, he got back home.  As well as the witness could remember, he left home on that same evening to help Charley Oberchain drive some cattle to Austin, and was gone about two weeks.  Will Lee left with him.  The parties at the house on Tuesday evening when defendant left to go to Austin with Oberchain were Alice Crowder, afterwards Mrs. Ditson, Melissa, Annie, Lizzie and Fred Scott, witness and her husband. Defendant was notified by note from Mr. Oberchain that the latter would start to Austin on Tuesday.  The note was addressed to defendant, and was brought from San Antonio by

Will Lee. Witness did not know what had become of the note. Witness had known Frank Harris about two years at the time of his disappearance. He had worked for the witness's husband. He was working for Mr. Carroll Brannon at the time of his disappearance. On the Sunday prior thereto he was at witness's house, and on that occasion he and defendant had a dispute. Witness did not know when he was last at her house prior to that Sunday. Witness's husband was at home all day on Monday and Tuesday, September 15 and 16. He was at home on Tuesday evening and night after the defendant left. He was unwell for several days, lying and sitting around. The families of the witness and Carroll Brannon were friendly, and interchanged visits up to the Sunday previous to the disappearance of Harris. Subsequent to the disappearance of Harris, Jim Pitts, Mrs. Carroll Brannon's brother, married the witness's daughter Melissa.

Cross examined, the witness stated that she had never seen Harris since the Sunday previous to his disappearance, when he was at her house and had the dispute with defendant. Nor had she ever seen his sorrel horse since. Harris came to witness's house between nine and ten o'clock on that day, and was there at dinner, but did not spend the day. Witness did not know whether or not he went to church, but he went from the house towards the church. Annie Scott attended Sunday school, but did not return under Harris's escort. She came back in the wagon with the family. Pitts and Harris came back at the same time and with the party, but riding horseback. The parties together had dinner at witness's house. They included Harris, Pitts, T. J. Scott, and Annie and Melissa Scott. Witness could not say whether or not the defendant was there at dinner, nor, if not, at what hour afterwards he got home. Ditson was not. She was not sure that Will Lee was at dinner. Mrs. Drowns was there. The row between Harris and defendant took place in the road, ten, fifteen or twenty steps from the house, a short time before sundown. Witness did not know how long defendant had been home when the row occurred,—an hour, or perhaps not more than half an hour. Witness did not know what passed between Harris and defendant except that she heard them both cursing. If George M. Jones passed witness's house about the time of the row, the witness did not see him. When Harris rode off just after the row, he went towards Brannon's house, and that was the last the witness had ever seen of him. De-

fendant was then in the yard. If he had a gun or pistol, or if his grandmother, Mrs. Drowns, went to him, the witness did not know it. Witness did not know where her daughter Melissa, nor Mrs. Drowns, nor Jim Pitts, were at the time of the row. Witness was in her yard, forty or fifty yards from the road, when Harris left. The row occurred on the fourteenth day of September, 1884. She located the day by the almanac which she consulted in time to fix the date.

It was the day subsequent to this event, being Monday, September 15, that defendant and Will Lee left the house to go to San Antonio. Defendant came back from San Antonio alone. Witness did not know where Pitts was when defendant got back from San Antonio. Defendant slept at witness's house on Monday night. Defendant's employment at that time was digging a well for Mr. Matyear. Witness did not know whether Matyear lived nine miles southeast of her house or not, but he lived to the right of witness, with reference to the location of San Antonio. The defendant did not abandon his job on that well when, on Tuesday evening, he left home to join Oberchain at Boerne and go with him thence to Austin. Defendant left home alone on that Tuesday evening, and did not return for two or three weeks. At this point the witness was interrogated as follows:

"Did you not, on the habeas corpus trial of Frank Scott, on July 5, 1886, testify as follows: 'Frank Scott was not gone a week after that Sunday; maybe he was gone until next day. He said he was going to an Englishman's named Matyear?'"

To which the witness replied: "I don't remember that I did;" and here her testimony, as reduced to writing, on the habeas corpus trial, was shown her, and she said: "I guess that is my signature you are showing me. My testimony was read over to me on the habeas corpus trial, and I pronounced it correct. I don't think I have stated differently now. I have stated this evening that Francis left my house on Tuesday afternoon to meet Oberchain between my place and Boerne, to go to Austin, and that he was gone about three weeks. I don't remember testifying on the habeas corpus trial that 'Frank Scott was not gone,'" etc.—the statement embodied in the question.

Continuing her testimony under cross examination, the witness stated the defendant was not at home a part of the day on the fifteenth day of September. She did not know when the defendant left nor when he came back on that day. Witness did not remember when defendant went to Austin, but she did not

35 — Tex. App. XXIII.

think that, on the habeas corpus trial, she said it was in December. Her memory was not very good, but, according to her recollection, Oberchain and defendant went to Austin on September 16, 1884. Witness thought she told the truth on the habeas corpus trial, and was telling the truth now.

Question: "Is is true that Frank Scott went back to his work at Matyear's on Tuesday evening, digging the well? You say both statements are true?"

Answer: "I don't know how to answer that. I have told you all about what I know, and about as straight as I know how to tell it. Francis did go to Matyear's on Tuesday evening; he went to join Oberchain from our house. Will Lee brought a note over to our house, and next day Will Lee took that note down there. Mrs. Pitts married on October 3, and defendant was at the wedding."

The witness did not remember that defendant received a letter from Jim Pitts while the latter was in the Austin jail. Harris, when at the witness's house on the Sunday before his disappearance, had on a suit of dark clothing—coat, pants and vest of the same material. The coat in evidence resembled Harris's coat. Witness did not know what kind of boots he wore. If Harris was then courting her daughter Annie the witness did not know it. Witness thought that there was a Mexican at her house on the Sunday before the disappearance of Harris, but she did not know his name.

Mrs. Melissa Pitts, the daughter of T. J. and Laura Scott, the widow of Jim Pitts, and the sister of defendant, was the next witness for the defense. She testified, in substance, that she was at her father's house, where she lived, on Sunday, September 14, and witnessed the quarrel between Harris and the defendant. On the morning of the next day (Monday) defendant went to San Antonio, returning on Tuesday, September 16. On Tuesday morning the witness went to Mr. Gilbert's house, about half way between San Antonio and her father's house, and at Gilbert's house, at about eleven o'clock a. m., she saw the defendant. He was then on his way to Leon Springs to join Oberchain, and go with him to Austin. Harris, at the time of his disappearance, was paying attention to witness's younger sister Annie, and Pitts, whom witness afterwards married, was addressing witness. Witness did not then know that Harris and Pitts had ever had trouble. She had then known Harris about two years, and knew the sorrel horse he then owned.

Pitts spent part of the Sunday before Harris's disappearance at the witness's father's house, and part of it at the house of his sister, Mrs. Carroll Brannon. Witness did not see him on the following day, nor on Tuesday. She saw him on Friday riding a brown horse. He did not have Harris's sorrel horse. That horse was never at Scott's house after it was ridden there and away from there on Sunday, September 14, by Harris.

The witness had known Carroll Brannon and his wife nearly four years at the time of Harris's disappearance, and up to that time, and for some time afterwards, had been on friendly terms with them. Subsequent to the disappearance of Harris, or about the last of September, 1884, the witness had a conversation with Mrs. Brannon, at her house, in which conversation the disappearance of Harris was spoken of. Witness asked where Harris was. Mrs. Brannon replied that on Monday morning Harris, complaining that Jim and Joe (Jim Pitts and Joe Brannon) would not take his horse to water, quit his work on the tank and went off towards the water hole, and that she had never seen him since. Again, about October 1, 1884, at the house of the witness's father, Mrs. Brannon made substantially the same statement to the witness. She said he went off with Jim Pitts and Joe Brannon. There were present at Scott's house, on the Sunday of the quarrel between Harris and defendant, T. J. Scott, Mrs. Laura Scott, Alice Crowder (afterwards Alice Ditson), Mrs. Drowns, Jim Pitts, Will Lee, the witness and her sister Annie. Those parties and the Brannons were then friendly; were friendly after the disappearance of Harris and up to the killing of Jim Pitts. The Scott family and the Brannon family were not on friendly terms at the time of this trial. Defendant worked part of the day of the Sunday of his quarrel with Harris on Matyear's well. Witness remembered a note from Oberchain to defendant about going to Austin. It was left at the Scott house on Monday, September 15, by the stage driver. She did not know which of the family it was given to, but it was delivered to defendant on Tuesday by Will Lee. Witness did not know what had become of the note, but defendant kept it for a long time.

Cross examined, the witness stated that she was in San Antonio at the time of defendant's habeas corpus trial, but did not testify. Will Lee was then somewhere between San Antonio and New Mexico. She did not remember the date of his return, but thought it was either September or October. The witness

was absolutely certain that Ditson was not at her father's house
on the Sunday of the difficulty between Harris and defendant.
Mr. Van Riper was there that night. Harris came to Scott's
house on that day from Sunday school, and took dinner there.
Frank Yahn, a young man from Fort Worth or Waco, was
another person who took dinner there. Witness and Jim
Pitts went to Brannon's after dinner, and returned after
a couple of hours. Yahn had then left, but defendant and
Harris were still there, and everybody were on friendly
terms. The witness did not know the occasion of the row be-
tween defendant and Harris, further than that it was something
about Harris wanting to marry her sister Annie. Witness was
on the gallery of the house during the row, but could not fix the
positions of the other parties. If any one interfered to prevent
defendant from getting his gun on that occasion, witness did not
know it. The coat in evidence looked like the coat worn by
Harris on that occasion. His pants and vest were of the same
general color, but had, the witness thought, checks about three
times the size of those on the coat. The witness's little brother
was with defendant when witness saw him at Gilbert's on Tues-
day morning at eleven o'clock. Defendant was then on his way
home from Matyear's. He stopped but a moment to talk to wit-
ness and Mrs. Gilbert. Mr. Gilbert was then somewhere about
the house. Tuesday was September 16, 1884. Defendant then
told witness that he was going to Austin. Witness next saw de-
fendant on the following Sunday week,—at least that was her
impression. She did not think that defendant was absent on his
Austin trip as long as three weeks. The witness was married
on the third day of October, within three weeks of the Tuesday
she saw defendant at Gilbert's, and defendant was at his father's
house when the witness was married. Witness went to Gilbert's
on Tuesday and stayed there until Thursday. Oberchain's letter
to defendant was delivered by the stage driver at Scott's house
on Monday, and was taken by Will Lee to Gilbert's (he going
with witness), on Tuesday, to be given to defendant. Witness
did not see the note delivered to defendant by Lee. She did not
see defendant on Tuesday. Lee and her little brother went with
witness to Gilbert's. Witness knew her husband's hand writing.
The letter shown her did not appear to be in her husband's hand
writing. It appeared to be signed "Jim Pitts," whereas her
husband usually signed his name "J. B. Pitts." The writing,
however, bore a striking resemblance to her husband's hand;

and it, as well, bore a striking resemblance to the hand writing of Carroll Brannon, but the witness could not say that Brannon wrote the letter. Witness never saw the letter in the possession of defendant.

Witness first saw Jim Pitts after Sunday, September 14, on the following Friday. She saw him next on the ensuing Sunday. Witness and the members of her father's family maintained friendly relations with the Brannons until the twenty-first day of February, 1885, when Jim Pitts was killed near New Braunfels. Pitts was killed on the train. Cal. Brannon was on that train. He afterward went to New Braunfels as a witness for the defense in the investigation growing out of the transaction in which Pitts was killed. He was not put on the stand by the defense, and was used by and testified for the government, and that enraged the witness. The unfriendliness between the families, however, did not spring from that cause, and witness refused to state from what cause it did spring. She denied that she procured Pitts's pistol at Brannon's house, and took it to Pitts while he was in jail in Austin. If defendant carried one of Pitts's two small pistols, the witness did not know it. In reply to a question the witness said that she did not think she testified before the grand jury that defendant went to Matyear's on Monday, the day after his quarrel with Harris. It was her recollection that she told the grand jury that he either went to Matyear's or to town, she did not know certainly which. Witness had not seen Harris, his horse or saddle, since the Sunday of his quarrel with defendant. She did not know the saddle tree said to have been found in the woods, but heard some one say it belonged to Ditson. One of Harris's front teeth was out, and he had others decayed. The teeth exhibited looked somewhat, but not exactly, like Harris's teeth, and witness would say they were not his teeth. Witness did not know whether Harris had a long or short, or broad or narrow chin.

Defendant went to San Antonio on the Monday after his quarrel with Harris, according to his statement to witness, to go before the grand jury. He did not say that he was going before the grand jury to indict Harris. Witness did not know what defendant said to Van Riper at his father's house on the Sunday night before he went to San Antonio. George M. Jones passed Scott's house while Harris and defendant were quarreling. Defendant and Mrs. Gilbert both told witness that defendant spent the night of Monday, September 15, at Gilbert's house.

Witness could not describe, nor give the name of, the stage driver who delivered Oberchain's letter to defendant at Scott's house.

W. G. Lee testified, for the defense, in substance, that he was at Scott's house on Sunday evening, September 14, 1884, and witnessed, but did not catch the words of, a quarrel between Harris and defendant. On the next day witness, defendant and Van Riper went to San Antonio. Witness returned to Scott's on the same evening. Defendant came with him as far as Gilbert's, where he stopped to stay over night. He was then at work for Matyear, near Gilbert's. Between eleven and twelve o'clock on the next day the witness saw defendant at Matyear's. Witness went there to help defendant, and to take his place while he went with Oberchain to Austin with some cattle. Witness knew nothing about defendant getting a note from Oberchain. Defendant left Matyear's about noon on that Tuesday, to go home, and witness did not see him again on that day. About a month after the quarrel between Harris and defendant, witness heard Mrs. Carroll Brannon, at Scott's house, say, in the presence of Scott's family, that the last she saw of Harris was when he rode off from her house, on Monday morning, to water his horse.

On his cross examination, the witness declared that, in her statement to the Scotts about Harris's disappearance, Mrs. Brannon did not say that Harris went off to water his horse with Joe Brannon. On the contrary, she said that he went off alone, and that she never saw him afterwards. Witness and defendant went to San Antonio on Monday, with Van Riper, who summoned them as witnesses for the prosecution in the case of The State v. Dolores Rosa. Witness went before the grand jury in connection with that case. Defendant went before the grand jury about the row between him and Harris. Witness did not know the cause of the quarrel between defendant and Harris. Witness was riding about the country the larger part of Sunday, September 14, 1884, and could not now say whether he took dinner with Bourgeois or not, nor whether he had any dinner on that day. He did not get back to Scott's until three o'clock, and did not take dinner there. No such man as "Yahn" was at Scott's when witness got there at three o'clock. Witness never heard of such a man. There was no Mexican on Scott's place on that day. The witness delared that he knew nothing about the reputed Oberchain letter. He may have taken a letter to defendant at Matyear's on Tuesday, but if he did so he had no recol-

lection of it, and thought that he would remember it if he did so. Defendant knew before Tuesday that he was going to Austin with cattle for Oberchain, for he informed witness of his engagement to do so on Monday. Mrs. Jim Pitts (then Melissa Scott) went with witness to Gilbert's. Witness saw defendant next about two days after Tuesday, September 16. On that day he came to the well and told witness that he had secured a job with Oberchain to drive beeves to Austin, and that he saw Oberchain at Leon Springs. Witness next saw him about eight days later at the house of his father, T. J. Scott. He spoke of having been to Austin, but witness could not now say whether or not he said Oberchain went with him.

John Traynham was the next witness for the defense. He testified that he lived at Austin, Texas, and was chief deputy United States marshal. Prior to February 1, 1886, as deputy United States marshal, he had charge of the Austin branch of the western district. He knew the defendant, and he knew Carroll Brannon. He was present at the trial of defendant before United States Commissioner Ruggles in Austin. Carroll Brannon was the principal witness against Scott in that case. Brannon was not a witness before the grand jury in that case, but when the warrant issued for the arrest of Scott, he went as guard to aid in the arrest, and returned with the deputy marshal who had Scott in charge.

Cross examined, the witness stated that he heard Carroll Brannon testify in the case against defendant. The witness's feelings for the defendant were friendly prior to the filing of the charges against him at Austin. Since then witness has been somewhat prejudiced against him. Deputy Marshal Walker guarded Dick Brannon to the Chester penitentiary. On his return he said that, from a conversation with Dick Brannon, he was convinced that defendant was a participant in a certain post office robbery, and that he thought that Carroll Brannon and some others were cognizant of some facts in connection with it. Walker made the affidavit upon which the prosecution against defendant was predicated.

Mrs. A. P. Gordon was the next witness for the defense. She testified that she lived at Shavano post office, in Bexar county. She knew a man named Frank Harris, whom she first met at Locke Hill. She last saw that man, or a man whom she took to be him, about three weeks after she heard the neighborhood talk of Frank Harris's disappearance. She would not swear

positively that the man she then saw was Frank Harris, but she thought so. He rode by her house and bowed to her as she sat at her window. On cross examination, this witness declared that she could not tell how long ago it was that she heard the neighborhood talk of Harris's disappearance, or that she saw the man she took to be Harris. She could not say that it was but two and a half years, though she guessed it was about that time ago, or that it was as long ago as ten years.

W. R. Gregg testified, for the defense, that he lived in Travis county, Texas. He knew Tom Scott and had seen Carroll Brannon three times. Witness saw Tom Scott and Carroll Brannon together in Austin, in January, 1885. He heard them one night talking about a man they called Frank Harris. They were at Schneider's wagon yard, and spoke of the theater that night, and Scott, referring to one of the actors, said: "I believe that man who acted is Frank Harris." Carroll Brannon, replying to that remark, said: "I know d—d well it is."

W. H. Hyatt was the next witness for the defense. He testified that he knew a man named Frank Harris. He first saw that man plowing in the field of T. J. Scott, the father of this defendant, in the winter of 1883, and became acquainted with him at that time. The witness was a farmer and a peddler of fruits and vegetables. A camp meeting was held at Carter Point, commencing either on the last Friday in August or the first Friday in September, 1884, the witness could not now be certain which. He procured a load of vegetables and fruits to peddle at the camp meeting, which he attended with his family, staying ten days. Accounting for his movements for six days after he left camp meeting, he located himself at Leon Springs on the sixteenth day after the camp meeting. On that sixteenth day after the camp meeting commenced, whether late in August or early in September, 1884, the witness saw Frank Harris (the same man he saw plowing in old man Scott's field) and Gus Levy at Leon Springs, and sold some fruit to each of them. He sold fruit to Levy first, and then to Harris. the two then being about fifty yards apart. He sold the fr    on credit, and had never been paid by either Levy or Harris. Witness was then near enough Harris to hand him the fruit. Witness joked him about the purchase of the fruit, with the remark that he was getting it for the old lady. Harris replied that witness was mistaken; that he "was working for a young woman, but they think I am after the old one." To the best of witness's recollec-

tion, he mentioned the name "Annie." This episode was a mere bantering of words between witness and Harris, after the latter's purchase of the fruit.

Cross examined, the witness said that he could fix the date of his last meeting with Frank Harris at Leon Springs only by the camp meeting, which he knew commenced either on the last Friday in August or the first Friday in September, 1884. Harris and Levy were not then together, but were about fifty yards apart. Witness could not say positively what colored clothes Harris was then wearing, or what kind of a horse he was riding, but, according to the best of his recollection, Harris had on dark clothes and was riding a sorrel horse. Witness never observed Harris's teeth, and could say nothing about them.

Mrs. Maggie Crane was the next witness for the defense. She testified, in substance, that she knew Mrs. Carroll Brannon, and in the month of March, 1885, was at her home. Witness asked Mrs. Brannon what she supposed had ever become ot Harris. Mrs. Brannon replied that at and for a short time before his disappearance he was in the employ of her husband, working by the day; that on Monday morning, the morning after the row at Scott's, Harris came to the house exceedingly angry, and Mr. Brannon, who was then on the eve of starting to San Antonio, asked him if he was going to work that day, remarking that days worked were paid for and days off were not; that Harris replied that he was so angry he did not know whether he could work; that about ten o'clock on that morning Harris asked her where the boys were; that she told him they had gone to water their horses, when he said that he supposed he would have to water his horse, and got his pistol; that she begged him not to take his pistol, and accused him of a purpose to go to Scott's, and that Harris replied that he would see his girl before sunset if he waded through blood waist deep. She further stated that about sunset Jim Pitts and Frank Scott came to her house, and she begged Scott not to stay all night, as she was afraid Harris would return, and she did not want trouble at her house in her husband's absence; and that in reply to this appeal from her, Pitts said there would be no trouble, because he did not think Harris would return that night, and that if he did, there would be no row in her yard while her husband was away.

This witness was subjected to a very rigid cross examination, but it resulted in no material change of her testimony in chief,

nor did it develop any new fact, except her statement that Mrs. Brannon, in the conversation detailed, expressed her belief that Jim Pitts and Frank Scott killed Harris, basing that belief upon the fact that Pitts and Scott came to her house about sundown on the Monday that Harris left, and that Harris had never been back. She stated that this conversation occurred on her first visit to Mrs. Brannon, which she made through sympathy, Mrs. Brannon's husband then being in jail, charged with complicity in the murder of Gosling. The witness was in no way related to the Scotts, but had been quite intimate with them since the defendant became involved in this trouble, that misfortune enlisting her sympathies.

Pickens Patten was the next witness for the defense. He testified, in substance, that he lived in Kendall county, and had lived in that county for a number of years,—off and on since 1852. He formed the acquaintance of a man named Frank Harris at Scott's house. Some time after that, and prior to the presidential election of 1884, which occurred in November of that year, the same man Harris came to witness's house, in Kendall county, seeking to hire some boys to help him dig holes for Mr. Patch. The witness next saw that man on the day of the presidential election, in November, 1884, in Blanco City, Texas. Witness did not recognize him at once, as he was wearing his beard a little different than on the previous meetings spoken of. He gave his name as Harris to the witness, and recalled his visit to witness's house, and witness then recognized him. But few words besides the mere salutation of "howd'y'do" passed between witness and the man. The witness verily believed that the man Harris he saw in Blanco City in November, 1884, was the same man who came to his house in Kendall county, and whose acquaintance he had previously formed at the house of T. J. Scott, in Bexar county.

The cross examination of this witness was a very searching one. It resulted first in his declaration that he was afflicted with a very feeble memory as to names and dates, and a very good one as to faces. He first declared positively, and affirmed it on his oath, that the man whom he saw on election day in Blanco City was the man to whom he was introduced at Scott's some time before as Frank Harris. He then declared his inability to state such fact upon oath, but reiterated that he verily believed the man he met at Blanco City was the Frank Harris to whom he was introduced at Scott's. He knew that Cleveland was now

president, and was elected in November, 1884, but he did not remember the name of the man over whom he was elected,— whether it was Grant, Garfield or Greeley. He could remember that there had been other presidents than Cleveland, and instanced Tilden and Garfield.

T. A. McBride testified, for the defense, that he lived in Guadalupe county, and lived there in December, 1884. He had never seen T. J. Scott nor the defendant until he saw them in the court house on this trial. On or about December 15, 1884, the witness locating the date by an entertainment given in the neighborhood to celebrate the settlement there of a schoolmate of his youth, a man, who introduced himself as Harris, came to witness, at his well, near his house, in Guadalupe county, and asked if witness could direct him to the house of Mr. Doc. Scott. The witness replied that he could, and gave him the direction. In the conversation that ensued the man said that he worked for a time in the employ of Mr. Doc Scott's brother, went off and went back, when he had a difficulty with the son of Doc. Scott's brother, left again, and would not go back, and decided to go to Mr. Doc. Scott's in Guadalupe county. When he left the well he went towards Doc. Scott's, in the direction indicated to him by witness.

On his cross examination, the witness reiterated the substance of his testimony in chief, and added that he did not attend the entertainment, but often heard his children speak of a strange man they saw at the entertainment. Witness was unable to say that the strange man they saw at the party was or was not the man he saw and talked to at the well.

W. B. ("Doc") Scott was the next witness for the defense. He testified that Tom J. Scott was his brother, and the defendant was his nephew. Witness knew and lived near T. A. McBride, in Guadalupe county. Witness knew a man called Frank Harris whom he first met at the house of his brother, Tom Scott, near Leon Springs, in Bexar county. The witness was well satisfied that Frank Harris, the man he saw at his brother's house, came to his house one evening eight or ten days before Christmas, 1884. He went to Phillips's house to a dance party on that night with the witness and his children, and left Phillips's with them, and spent the night at witness's house. He left the witness's house on the next morning, and told witness that he was going to Mexico. He said that he came to witness's house from Blanco. He was dressed in his laboring clothes, and told witness that he had

left his clothes at Carroll Brannon's. He said further that he had been looking for work, had failed to find it, and was going to Mexico. He told witness that he had a row at Tom Scott's, and that he and his antagonist were drunk, but did not say what the row was about.

On his cross examination, the witness declined to swear " without an if, and, or equivocation," that the man he saw at his house in December, 1884, was Frank Harris, but he verily believed it. The man rode a gray horse to witness's house and wore a light colored coat, and pants and vest of dark stuff. Witness knew Pickens Patten. The man Harris told witness in December, 1884, that he met Patten in Blanco City on the day of the pressidential election, and that he shook hands with Patten. When he left he requested witness to tell Mr. Brannon that he, Harris, had gone to Mexico. A day or two later witness got a letter from Harris purporting to have been written from San Antonio. He did not know what had become of that letter.

W. R. Phillips was the next witness for the defense. He testified that he lived in Guadalupe county and knew Doc Scott and T. A. McBride. Witness gave a party at his house between the fifteenth and twentieth of December, 1884. Doc Scott attended that party, and introduced the witness to a man he called Harris. Harris came to and left the party with Doc Scott and his girls.

Cross examined, the witness said that he had given several parties at his house prior to that he gave in December, 1884, and had given none since. Witness began thinking about this matter when Doc Scott, in the fall of 1887, asked him if he did not remember being introduced to a man named Harris, at the party. Witness stated that he was testifying in February, 1888. Doc Scott refreshed his memory, and told him that he expected to need witness on this trial. He, Doc Scott, told witness that he thought the man was Harris, but did not know, and that if it was not, the man played it very bold on him. What Doc Scott told witness did not refresh his memory. What his, witness's, wife did tell him refreshed his memory, and he was testifying now from what his wife told him and not from his own memory. Witness wanted to testify to all his wife told him. She told him that this year (1887) is 1888. That would place this party four years ago in December. Witness was certain that the party was given four years ago—quite as certain as he was that the man Harris was at the party.

On his redirect examination, the witness said that he was not

swearing to facts he gathered altogether from his wife.  He knew the facts before he asked his wife, and consulted her to ascertain if he was right as to the time Harris was at the party. He was not testifying to the time upon her information.  He knew himself that the party occurred just before Christmas, 1884. This is the year 1887.  In stating that it was 1888, the witness made his mistake.

Re-cross examined, the witness admitted that he was "mixed" as to dates.  Counsel was at liberty to try witness and see if he was easily mixed.  Witness had fixed up nothing to tell.  He was thirty-two years old, having been born in 1884, or, rather, in 1854.  He was mixed again.  He was married eleven years ago; he did not remember the year, was "bothered" as to dates, and admitted that he was "mixed" again.  He was married either in 1874 or 1875, he did not know which.  His eldest child was ten years old.  He could not tell the year of its birth, and candidly confessed that he was "mixed" again.

G. W. Marnoch testified, for the defense, that he saw Will Lee and defendant in San Antonio between three and four o'clock on the evening of September 15, 1884.

Miss Alice Tye testified, for the defense, that she had a conversation with Mrs. Carroll Brannon, in Brannon's house, in June, 1885.  In that conversation, and in answer to a question by witness, Mrs. Brannon said that Harris left her house with Mr. Brannon and Jim Pitts, to go to Leon Springs to water his horse, and that she had never seen him since.  Susie Crane was present.

By several witnesses for the defense it was proved that the defendant's suspected complicity in the murder of Frank Harris was common, current talk throughout the city, county and neighborhood of his residence, and that it was the theme of editorials in newspapers for several days before the defendant's arrest and while he was at large, and that he had ample opportunity of becoming informed of the suspicion directed against him.  One witness testified that he read aloud to various members of defendant's family an editorial in the San Antonio Express, containing a circumstantial account of the disappearance of Harris, concluding with the statement that the defendant was suspected of his murder.

Mary Gugge, testifying for the defense, stated that she had charge of Gugge's store on the Helotes, in November, 1884.  If Celestine Yeager and defendant had visited that store together on any Sunday morning in November, 1884, the witness would

have known and remembered it. She had no recollection of any such visit. She never, at any time, saw defendant and Celestine Yeager together at Gugge's store.

The defense closed.

The State introduced and read in evidence, in rebuttal, the written testimony of Mrs. Laura Scott, delivered on the habeas corpus trial of the defendant. It showed that she made statements in that proceeding which, on this trial, she denied having made.

The evidence in this case covers nearly two hundred pages of the transcript, and of course has been greatly condensed in this report, by the omission of the numerous reiterations elicited from the witnesses, and of much testimony of no ostensible or material bearing upon the contested issues. It is believed, however, that nothing of consequence has been overlooked.

*J. H. Copeland* and *M. G. Anderson*, for the appellant: Appellant's application for a change of venue was in due form, and contained all the statutory requisites, and he alleged therein that "there exists in the county where the prosecution is commenced so great a prejudice against him that he can not obtain a fair and impartial trial," supported by his own affidavit and the affidavits of three credible witnesses. It is contended that the counter affidavit filed by the State's attorney, and the evidence adduced by the State, were insufficient to defeat the application. The proper practice in our courts seems to be either to attack the credibility of the affiants or their means of knowledge. In this case the latter mode was adopted, and it therefore devolved on the court to order the appearance before the court of the said affiants, so that their means of knowledge could be individually and separately tested. The court having failed to use this precaution, it certainly abused its legal discretion in overruling appellant's application for a change of venue to such an extent as to justify, if not require, revisal and reversal. It is an easy matter to get persons who honestly believe that there is or is not such prejudice, but the main issue in such a trial by the court is, what are the means of knowledge of the affiants, and, as long as they remain unimpeached, and no attempt was made to impeach them and controvert their means of knowledge, the application ought to have been granted, and the cause removed to a county where a jury which would have, at least,

listened to the testimony for the defense could have been obtained.   (19 Texas Ct. App., 201, 220, 223; 2 Texas Ct. App., 613.)

The application for continuance was based on the absence of material witnesses, among others, Sells Anderson and Julius Hufman, who well knew Frank Harris, and by whom the defendant expected to contradict the State's principal witnesses, Mrs. Mary Brannon, her husband and others, by proving that said Frank Harris was seen alive and well long after the date of the alleged killing.   The importance of their testimony was shown on the trial of the case, when other witnesses, either not at all or only slightly acquainted with the said Frank Harris, positively testified to having seen a man of his name and description long after said date.

The application contains every allegation and requisite prescribed by Article 560, Code of Criminal Proccedure, none of which was controverted under Article 564, or any other provision of said code.   Yet this application was refused (although the first application) and no reason assigned therefor, leaving the inference that the trial court deemed their testimony either inadmissible or immaterial, when in truth and in fact it was both admissible and of the greatest moment to the defendant.   The evidence of the absent witnesses would, doubtless, have been more positive than that of the kind adduced; but, even if this had not been the case, the jury would have been warranted in giving more credit to the opinions and statements, as to the existence of Harris, of the many than the few, and although cumulative, the defendant was entitled to their testimony.   (5 Texas Ct. App., 596; 6 Id., 507; 12 Id., 554.)

Injury was done to the defendant by refusing this first application, because the absence of William Coombs was caused by severe illness, certified to by his attendant physician, which certificate was duly submitted to the court and filed.   Said witness was also under a good and sufficient bond for his appearance, and no forfeiture thereof was taken, on account of his physician's certificate, and yet the defendant was forced into this trial without the benefit of his testimony.   There was no question raised as to the diligence used to secure his attendance; there was no room for complaint.

This application for a continuance was defendant's first; it gives the names and residences of a number of witnesses [several of whom appeared during the trial]; it shows that every effort and ample diligence was used to secure their attendance;

it appears therefrom that the testimony of these witnesses was of a material character, and that it is probably true; therefore it was no longer a matter of discretion with the court, but the defendant was entitled to a continuance as a matter of right. (2 Texas Ct. App., 455; 18 Id., 232; Id., 287.)

The court erred in overruling defendant's exceptions to testimony embodied in bills respectively numbered one, two, three and four.

The first exception of defendant was improperly overruled by the court, because, whatever the object of the question, the effect was to leave the impression on the minds of the jury that the witness had made statements in the grand jury room inconsistent with those made by him on the trial. The trial judge appends the remark that the question was asked to lay a predicate to impeach the witness. There is no evidence in the record that such an impeachment was ever attempted. Therefore the explanation should have no force or weight in the mind of this court.

The second exception was equally as good as the first. The same practice was employed to discredit a witness and to shake the confidence of the jury in his testimony. We respectfully urge that if for no other reason the court ought to reverse this cause. There are certain ways in which a witness can be discredited without playing on the credulity and imaginations of jurors. The secrets of the grand jury room should forever be inviolate, excepting in prosecutions for false swearing and perjury. (Code Crim. Proc., arts. 384, 393, 407.)

What bearing or relevancy Mrs. Pitts's statement in reference to pistol, etc., has to the case at bar, we have so far failed to perceive. The witness was an innocent bystander at the murder of Hal Gosling, and, unfortunately, the wife of the principal actor therein. Was not any reference to the Hal Gosling murder entirely irrelevant and inadmissible, and did it not naturally inflame the minds of the jury not only against the witness but also against the defendant? The minds of the jurors had been so often tortured and their passions excited by the production of the skeleton, that due precaution should have been taken to prevent any further prejudice to the defendant by referring to a most foul murder with which the defendant was not in the remotest degree connected, although he had the misfortune to be related by affinity to one of the murderers.

The fourth exception was to the introduction of a certain letter

alleged to have been written by Jim Pitts and found near the residence of the defendant. Remarks and testimony in reference thereto were offered to the jury which unquestionably operated on their minds and imaginations to such an extent as to convince them that the said letter, if nothing else, would convict the defendant. The State's attorney attempted to prove the hand writing (over the protest of defendant's counsel) by only Mrs. Brannon and her husband. The letter was inadmissible as evidence, as the prosecuting attorney must have known, else he would have offered it in evidence; in which, as the record shows, he entirely failed. Then why did the State's attorney so triumphantly produce said letter before the jury and then fail to offer the same? Surely such practice would justify a reversal in an appeal from a justice court, let alone in one in which a man's life and liberty were involved. We deem that the propositions made under this assignment are invulnerable, and do not need the citation of authorities to sustain them.

The court erred in overruling the defendant's motion for a new trial. The developments of the trial showed conclusively that, if the defendant had had the testimony of the witnesses named in his first application for a continuance, the verdict of the jury might have been different, notwithstanding the conduct of some of the jurors in failing to give attention to the testimony for the defense. This conduct of the jury ought to have received the severe reprimand of the court, and should have caused the court to grant a new trial and grant the defendant's prayer for a change of venue.

Appellant's motion for a new trial ought to have been granted, because his first application for a continuance was sufficient in law; the action of the court was duly excepted to, and the testimony of the witnesses named therein was important and probably true, which fully appears from the record, and the diligence alleged in the application was prima facie sufficient and was not contested in the mode provided by Articles 564 and 565 of the Code of Procedure. The questions whether the testimony alleged in the application is material and is probably true, are answered in the affirmative by the record in this case. (43 Texas, 138; 2 Texas Ct. App., 1; 9 Id., 601, 669; 13 Id., 51, 254, 468; 18 Id., 232).

When the trial court entertains any reasonable doubt in regard to the right of a convicted defendant to a new trial, in consequence of the overruling of his application for a continuance

asked for the purpose of securing material testimony, and denied because of the questionable truth thereof, the doubt should be resolved in favor of the defendant. (18 Texas Ct. App., 232.)

Appellant's motion for a new trial ought to have been sustained because the motion for a change of venue had been wrongfully overruled, as already shown in this brief. It became the right of the defendant to have his motion for a new trial granted, it having been so apparent that the effort to secure an unbiased and unprejudiced jury had failed. The trial court did not exercise that discretion and liberality in this regard that the law requires. (35 Texas, 361.)

5. The verdict of the jury is contrary to the law and the evidence. There is no evidence in the record of this case to sustain any of the elements of a "corpus delicti." Article 549 of the Penal Code provides that "no person shall be convicted of any grade of homicide unless the body of deceased, or portions of it, are found and sufficiently identified to establish the fact of killing."

What evidence of the identity of Harris's body was offered on the trial of this case? Clothes, supposed to be his Sunday clothes, were found with a skull and some bones in a cave; other small articles, the property of Harris, were found there, and, alas for the poor defendant, there were teeth missing from the jaw by which the witness Manning fully identified the remains! On such testimony the body of Harris was "clearly proved." All the authorities are agreed that the "corpus delicti" must be established by proof clear and satisfactory beyond a reasonable doubt; and that not even the extra judicial confession of the accused that he killed the person alleged to have been killed will, uncorroborated by other evidence of the death, be sufficient to warrant conviction. (Walker v. The State, 14 Texas Ct. App., 634.) This case is quite similar to the one at bar, the difference being that in the former the witnesses were disinterested, whilst in the latter they were seeking revenge. If the "corpus delicti" had been established in this case beyond a reasonable doubt, and even by positive testimony, where is the evidence in the record which connects this defendant with the killing, assuming that this was proven, although there was no reliable evidence of violence? The taking of Harris from the residence of Brannon is not proof of the killing. The fact of finding the remains of Harris, assuming them to be his, at the time and place shown, does not prove that the defendant was the murderer or an ac-

complice even.   The fact that the skull found in the cave had a
hole in it which looked like a bullet hole, but might have been
caused by a fall, does not prove that the deceased was killed by
violence, and that the defendant was the murderer; and yet
they are the most material facts brought out by the State.   We
respectfully submit that the evidence in this case does not suffi-
ciently inculpate the appellant, and does not support the verdict
of the jury.

The life or liberty of the accused ought never to be sacrificed
on the ground that it is only by regarding him guilty that an
explanation is afforded of the perpetration of a proved offense.
When it is manifest that injustice has been done the defendant
in the trial of the cause, and the verdict of the jury is wrong,
even when there is evidence to support it, the Court of Appeals
will set it aside.   (14 Texas Ct. App., 629; 3 Id., 335, 567, 581;
5 Id., 398, 421, 423.)

It is not only the right, but it is also the duty, of this court to
pass upon the sufficiency of the evidence in this case, which the
court will find, in our opinion, insufficient to support the ver-
dict.   Even if the jury had been a fair and impartial one, it
could hardly have been expected, in view of the length of the
trial, and the amount of evidence, to be competent to conduct
that course of correct reasoning necessary in a case like this.
With due attention they might have succeeded, but we truly
believe that this court will find that this jury failed to reach a
correct conclusion as to the guilt or innocence of the accused.

Another question which we submit to the court is as to the
sufficiency of the evidence going to show that Harris was seen
long after the time fixed of the alleged murder.   The testimony
of Mrs. Brannon finally fixed this time as the fifteenth or six-
teenth of September, 1884, on Monday or Tuesday, she did not
know which; when credible and unimpeached witnesses posi-
tively declare that he was seen first in November, 1884, in Blanco
county; about the middle of December, 1884, in Gaudalupe
county, and lastly on his way from San Antonio to Cal. Bran-
non's ranch, by way of the Babcock road.   Is not this evidence
sufficient to disprove the guilt of the appellant, or at least to
raise a reasonable doubt as to the guilt?   Will this court reject
the testimony of Mrs. Gordon, Wylie Hyatt, McBride, Doc Scott
and Phillips, because, forsooth, being unexpectedly called on
to testify as to the color of a man's hair, etc., which they had
seen long before, their testimony does not precisely dovetail, as

did the evidence for the State? We opine not. Writers say that there is no better evidence of fabrication than such exact correspondence.

In conclusion we most earnestly submit to the court that from the record of the trial of this cause it appears:

1.   That the defendant did not have a fair and impartial trial.

2.   That his cause was prejudiced by the rulings and charge of the trial court.

3.   That the witnesses, in their hatred of the defendant, and their desire to be revenged, were too willing and positive to be either reliable or credible.

4.   That even with their testimony the corpus delicti was not clearly proved and established.

5.   That the evidence, taken as a whole, does not prove that the appellant is guilty of the murder of Frank Harris.

*W. L. Davidson,* Assistant Attorney General, for the State.

Hurt, Judge. The errors assigned upon the record relate to the overruling of the application for a change of venue, for a continuance of the cause, and to the admission of testimony and the charge of the court.

1.   The sworn application for a change of venue, supported by the affidavits of three compurgators, sets up the existence of such prejudice against the defendant in Bexar county as will deprive him of the privilege of a fair and impartial trial. The counter affidavit, filed by the district attorney, attacks the means of knowledge of these compurgators, by showing that their residence in the county and acquaintance with its citizens are not such as to qualify them to speak in the matter whereto they depose. We think it is sufficient to raise the issue inquired into. This affidavit was supported by the oral testimony of no less than seven representative citizens of the county. No testimony in rebuttal was offered by the defendant. Had there not been sufficient evidence introduced to satisfy the mind of the court, it might of its own motion have called additional witnesses. We do not think, however, as is urged by appellant's counsel, that it was the duty of the court to have called the compurgators and have examined them touching their means of knowledge. In the overruling of the application we find no error. (Carr v. The State, 19 Texas Ct. App., 631; Davis v. The State, Id., 201; 21 Texas Ct. App., 277, 14.)

2.   That this court can not consider an assignment based upon error in overruling an application for a continuance, unless the record contains a bill of exceptions thereto, is well settled practice.   (Lucas v. The State, 19 Texas Ct. App., 79; Young v. The State, Id., 536; James v. The State, 21 Texas Ct. App., 353.)

3.   In Clanton v. The State, 13 Texas Court of Appeals, 139, it was held that a witness might be impeached by showing that he has made statements before the grand jury in conflict with his testimony on the trial.   That decision expressly overrules Ruby v. The State, and we still think the doctrine laid down in Clanton's case the correct one.   The court did not, therefore, err in permitting the questions complained of in bills of exceptions numbers 1, 2 and 3.   (19 Texas Ct. App., 267.)

4.   The charge of the court is full, fair and pertinent upon the law of alibi, and is helped by special instructions given at the instance of defendant, which, it may be remarked, are in some particulars more favorable than he was entitled to claim.   After a careful examination of this unusually lengthy record, we find no error of law requiring reversal.

Under circumstances detailed in the statement of facts, Frank Harris disappeared from his temporary home in the family of Carroll Brannon, in Bexar county, on the sixteenth day of September, 1884; and since that time, as found by the verdict rendered in this case, he has been seen no more among the walks of living men.   Nearly two years thereafter, a cave, so sequestered from view that its very existence was almost unknown, gave up the decomposing remains of a human being.   By one of those seemingly fortuitous chains of circumstances with which Omniscience sometimes aids the imperfections of human reason, these fleshless bones and faded shreds of clothing have been made to take on the veritable form of Frank Harris.   Motive, opportunity, and other strong inculpatory facts, pointed out the appellant as one of the actors in the crime.   These facts have been brought to bear upon the trial in such a manner as to fasten upon him the murder, and to attach to him its consequences. The evidence is circumstantial, but of more than usual cogency. It is in some respects, and particularly with regard to the defense of alibi, somewhat conflicting.   But the jury, as it was their province to do, have passed upon the conflicting questions, and out of them have returned a verdict which sustains the theory supported by the witnesses for the State.   It only remains for us to determine whether or not this testimony supports the verdict

found.    We are of opinion that it does, and hence decline to disturb it.

The judgment is affirmed.

*Affirmed.*